875 P.2d 370

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Michael BANKERT, Defendant–
Appellant.**

No. 20933.

Supreme Court of New Mexico.

May 2, 1994.

Rehearing Denied May 24, 1994.

Sammy J. Quintana, Chief Public Defender, Christopher Bulman, Asst. Appellate Defender, Santa Fe, for appellant.

Tom Udall, Atty. Gen., Joel Jacobsen, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

FROST, Justice.

Defendant–Appellant Michael Bankert drove with his common-law wife Kathy Christison from their home in Cortez, Colorado, to Farmington, New Mexico in order to buy cocaine for resale. Convinced they were not receiving adequate value for their money, Bankert shot and killed Robert Martin, a participant in the transaction. Bankert was convicted of felony murder, trafficking cocaine by possession with intent to distribute, and conspiracy to traffic in cocaine.

Six issues are raised on appeal: (1) Insufficient evidence supported the conviction for constructive possession of cocaine; (2) cocaine cannot be possessed in an unconsummated drug deal since the buyer and seller cannot both simultaneously possess; (3) the offense of trafficking a controlled substance by possession with intent to distribute cannot be the predicate felony to a felony murder conviction because it is not an inherently dangerous crime; (4) since provocation was not an issue in this case, the jury was improperly instructed to address a provocation element for second degree murder; (5) no evidence supported the conviction for conspiracy; and (6) the prosecution prejudicially linked Bankert with an already convicted participant in the crime. We affirm all convictions.

## FACTS

Michelle Hall, a reputed drug abuser, left Farmington, New Mexico around 3:00 p.m. on August 8, 1991, on a motorcycle to visit her friends, Bankert and Christison, in Cortez, Colorado. After the three ingested cocaine inside the couple's trailer-home, Bankert stepped outside. The door was open and he was probably able to hear the ensuing conversation between the two women. Christison asked Hall to help find two eight-balls of cocaine for $450. An eight-ball is three-and-one-half grams of cocaine. A single eight-ball is consistent with personal use, but Christison indicated she wanted enough to sell and make her money back. She implied she would give some cocaine to Hall for her efforts.

Later that evening, at the home of a friend in Farmington, Hall asked Bob Martin about obtaining the two eight-balls. He told her to speak to another person who was present, Chester Smith. Smith, an African–American, was a known drug dealer in Farmington. Smith, however, was reluctant to deal with people from out-of-state. Hall offered to act as a go-between.

Later the same evening, after phoning for directions to the home, Bankert and Christison arrived in Bankert's car. Christison gave $450 to Hall who almost immediately passed the money to Smith.

Smith, Hall, and Martin decided to go to the latter's house to make the exchange, leaving Bankert and Christison behind. At Martin's house, Smith revealed he would sell the two eight-balls for $500 rather than $450. He removed some of the cocaine to compensate for the $50 shortfall. Though she knew Christison would be upset, Hall accepted the reduced amount.

About an hour after leaving, Hall returned and gave the cocaine to Christison. The two women examined the drug inside the friend's home and Christison remarked, "This doesn't look like two eight-balls." Hall explained the change in the deal. Eventually Smith, Hall, and Christison were inside using Christison's scales to weigh the drug. Outside, Bankert complained that he could not understand

what was taking them so long. Eventually he entered the trailer, saying to Christison, "What the fuck's taking so long? Let's go."

As they left the home, Christison was very upset, almost crying. Bankert said he was pissed and this was bullshit because it was taking so long. Christison told him to go ahead and get mad, there was nothing he could do about it. They then engaged in a private inaudible discussion.

Martin suggested that everyone go to his house to straighten out the matter. Bankert, with Christison driving, and Hall giving directions, left in Bankert's car for Martin's house. On the way Christison and Bankert discussed the drug deal. Bankert complained, "I'm tired of this bullshit already. I'm not gonna be ripped off by a nigger." He went on: "Something better get figured out." Christison said, "We can get this straightened out." They stopped at the drive-up window of a liquor store to buy beer. "I'm not paying for it," said Bankert. "We've shelled out enough money already."

Shortly before midnight, August 8, 1991, the group in the Bankert's car arrived at Martin's house. No one else had yet arrived. While the others sat outside the car, Bankert moved to the driver's seat and sat sideways, with the door open, and his feet outside the car. Unknown to the others, he pulled a .22 caliber automatic pistol from a holster under the driver's seat.

Soon Smith and Martin arrived and everyone went into the house. Inside was a portable bar separating the kitchen from the dining area which in turn seems to have adjoined a living room. Bankert sat on a couch in the living room while Christison weighed the cocaine on her scales. Though the exact sequence is unclear, at various times Smith, Hall and Martin approached the bar to discuss the deal. Christison complained, "It's still only five and three-quarters [grams]. How am I supposed to make any money if I'm paying $100 a gram?"; or she may have said, "How are *we* supposed to make any money by paying $100 a gram?" (Emphasis added.)

Bankert arose from the couch and entered the dining room, sitting on the edge of a chair near the bar. It was now shortly after midnight. Smith took the $450 and dumped it on the scale as if to offer it back. Martin shouted, "Well, what the fuck do you want? Your money? Your money back?"

Bankert jumped up and grabbed Martin around the neck from behind. "I want it all!" he exclaimed. "I want seven [grams]! There's supposed to be seven! I want seven!" He pulled a gun from his waistband, under his shirt, and held it to Martin's head behind the right ear. Hall ran up to him pleading, "This is Bob's house. Bob's my friend. Leave him alone." Bankert retorted, "Fuck you, Michelle. I'll shoot you." He then shot Martin in the head. When Martin fell, he shot him again in the face.

Amid the screaming and panic Bankert stepped over Martin's body, and approached Smith threatening, "Are you ready to die, nigger?" Smith replied, "I don't want to die, I don't want to die, man." The gun fired as they struggled and Smith eventually wrested it from Bankert's hand. Bankert slumped to the floor where he remained until he was arrested soon thereafter.

Bankert was tried and convicted of felony murder, trafficking in cocaine by possession with intent to distribute, and conspiracy to traffic by possession with intent to distribute. He was given a sentence of life imprisonment plus nine years.

### STANDARD OF REVIEW

Our task is to review the record and establish whether the evidence is sufficient to support the criminal conviction of Bankert. In reviewing a claim of insufficient evidence, this Court will "view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict." *State v. Hernandez*, 115 N.M. 6, 26, 846 P.2d 312, 332 (1993). We may not weigh the evidence or substitute our judgment for that of the jury. *State v. Lankford*, 92 N.M. 1, 2, 582 P.2d 378, 379 (1978).

The test is "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to

every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988) (citing *State v. Montoya*, 101 N.M. 424, 425, 684 P.2d 510, 511 (1984)); *see also Jackson v. Virginia*, 443 U.S. 307, 307, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979) (holding that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992) (same). A conviction will be upheld if based upon a logical inference from circumstantial evidence. *State v. Baca*, 111 N.M. 270, 276, 804 P.2d 1089, 1095 (Ct.App.1990) (citing *State v. Brown*, 100 N.M. 726, 728, 676 P.2d 253, 255 (1984)), *cert. denied*, 111 N.M. 164, 803 P.2d 253 (1991). A conclusion based on mere conjecture or surmise will not support a conviction. *State v. Tovar*, 98 N.M. 655, 657, 651 P.2d 1299, 1301 (1982) (citing *State v. Romero*, 67 N.M. 82, 84, 352 P.2d 781, 782 (1960)); *see also* SCRA 1986, 14–6006 (Uniform Jury Instruction stating that "verdict should not be based on speculation, guess or conjecture"). The circumstantial evidence must be incompatible with any rational theory of the defendant's innocence. *State v. Vigil*, 110 N.M. 254, 256, 794 P.2d 728, 730 (1990). However, we do not dismiss all reasonable inferences supporting the verdict simply because some of the evidence may support a contrary verdict. *Id.*

## ISSUE ONE—POSSESSION

Bankert claims that there is insufficient evidence that he constructively possessed the cocaine and that his conviction for trafficking by possession with intent to distribute, in violation of NMSA 1978, Section 30–31–20(A)(3) (Repl.Pamp.1989), must be reversed. In order to reach a conviction for this offense, the jury must find proof of four elements outlined in the Uniform Jury Instruction, SCRA 1986, 14–3111. There is no controversy that under SCRA 14–3111(2), Bankert reasonably knew cocaine was present, and that under SCRA 14–3111(4), all the acts for which he was convicted took place in New Mexico on August 8 and 9, 1991. The issues in this case center on SCRA 14–3111(1),

whether Bankert was at any time in possession of the cocaine, and SCRA 14–3111(3), whether he intended to transfer the drug to another.

■ No evidence was presented that Bankert ever physically touched the cocaine. Nor does it seem that he ever became directly involved in negotiating the deal until the moment when he jumped up and held the gun to Martin's head. On the other hand, there is ample evidence that Christison, who was Bankert's companion on this business venture, handled the cocaine several times, acted as principal negotiator, and intended to recoup some of her money by selling some of the cocaine to others. The State's case against Bankert rests on an accessory theory under NMSA 1978, Section 30–1–13 (Repl. Pamp.1984): Bankert acted as Christison's accomplice. The distinction between a principal and an accessory to a crime has long been abolished in New Mexico by the legislature and the courts. *State v. Wall*, 94 N.M. 169, 171, 608 P.2d 145, 147 (1980) (citing *State v. Nance*, 77 N.M. 39, 45–47, 419 P.2d 242, 246–47 (1966), *cert. denied*, 386 U.S. 1039, 87 S.Ct. 1495, 18 L.Ed.2d 605 (1967)). If the evidence shows that Christison engaged in trafficking by possession with intent to distribute a narcotic drug, and if Bankert was her accomplice, then the predicate felony is established and Bankert's conviction will stand.

The elements of accomplice liability are listed in the Uniform Jury Instruction SCRA 1986, 14–2822:

The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the state proves to your satisfaction beyond a reasonable doubt that:

1. The defendant intended that the crime be committed;

2. The crime was committed;

3. The defendant helped, encouraged or caused the crime to be committed.

■ Christison's conduct on August 8 and 9 unequivocally points to the crime of possession with intent to distribute cocaine. In the afternoon of August 8, Christison and Hall

hatched a conspiracy to obtain the cocaine. We may infer from the evidence that Christison intended to distribute the drug after purchasing it. *State v. Muniz*, 110 N.M. 799, 800, 800 P.2d 734, 735 (Ct.App.) ("Intent may be proved by inference from the surrounding facts and circumstances...."), *cert. denied*, 110 N.M. 749, 799 P.2d 1121 (1990). Christison directly expressed this intention by saying she wanted to obtain enough to make her money back. Testimony by law enforcement experts was offered to show that two eight-balls of cocaine are more than a person would buy for personal use. *See, e.g., State v. Hubbard*, 113 N.M. 538, 540, 828 P.2d 971, 973 (Ct.App.), *cert. denied*, 113 N.M. 352, 826 P.2d 573 (1992); *see also United States v. Bell*, 892 F.2d 959, 969 (10th Cir.1989), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). Added to this was the presence of cutting agents and scales in Christison's back pack. *See State v. Bejar*, 101 N.M. 190, 191–92, 679 P.2d 1288, 1289–90 (Ct.App.), *cert. denied*, 101 N.M. 189, 679 P.2d 1287 (1984). Finally, Christison suggested that she would give some of the cocaine to Hall in exchange for her efforts in obtaining the drug, and this constituted the intent to distribute a controlled substance in violation of Section 30–31–20(A)(3).

The conspiracy to possess continued when Christison and Bankert arrived in Farmington. The cocaine, paid for by Christison, was transferred to Hall. At this point, Christison took constructive possession of the drug. Even before physically handling the cocaine, Christison was in a position to take it from Hall and drive with it back to Colorado. *State v. Carr*, 95 N.M. 755, 764, 626 P.2d 292, 301 (Ct.App.) ("Constructive possession requires no more than knowledge of the narcotic and control over it...."), *cert. denied*, 95 N.M. 669, 625 P.2d 1186, *cert. denied*, 454 U.S. 853, 102 S.Ct. 298, 70 L.Ed.2d 145 (1981).

When Christison used her scales to weigh the drug, she took physical possession and control of it. At Martin's house, she reiterated her intention to sell with her remark, "How am I supposed to make any money if I'm paying $100 a gram?"; or in a version of the statement which directly implicates Bankert: "How are *we* supposed to make any money by paying $100 a gram?" (Emphasis added.) The fact that a deal had been struck—that money was exchanged for cocaine—was evidenced by Smith's offer to return the money and rescind the deal by dumping the $450 on the scales. Martin made this idea explicit: "Well, what the fuck do you want? Your money? Your money back?"

Considering the first and third of the three elements in SCRA 14–2822, the facts show that Bankert emphatically wanted Christison to take possession of the cocaine and helped her do so. It is not controlling that he never touched the cocaine and was often not in the same room where the drug deal took place.

> The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval. (Citations omitted.)

*State v. Ochoa*, 41 N.M. 589, 599, 72 P.2d 609, 615 (1937), *quoted in State v. Salazar*, 78 N.M. 329, 331, 431 P.2d 62, 64 (1967).

There is ample evidence to demonstrate Bankert's accomplice liability in Christison's crime. At the very least the evidence indicates that he acted as a financier of the endeavor. His comments show that he did have some control or interest in the money used for the illegal purchase. At the drive-up window of the liquor store, he complained, "I'm not paying for it. *We've* shelled out enough money already." (Emphasis added.) Additionally, he provided transportation for the venture. He owned the car in which he and Christison made the trip from Colorado to New Mexico.

From Bankert's fretting and animosity and impatience—especially in the context of his later words and actions—the jury could assume he very badly wanted the deal to take place. He was enraged that the deal was taking too long, he expressed concern that he was being swindled. He threatened, "Something better get figured out," and Christison,

acknowledging their mutual interest, responded, "We can get this straightened out." Bankert proclaimed his fierce desire by shouting, "I want it all!" In the consummate attempt to help Christison close the drug deal, he enforced his demand by shooting Martin in the head.

By acting as Christison's accomplice, Bankert took constructive possession of the cocaine with the intention of distributing it. *See State v. Bauske*, 86 N.M. 484, 485–86, 525 P.2d 411, 412–13 (Ct.App.1974). No physical contact with the drug was necessary. *See* SCRA 1986, 14–3130 ("Even if the substance is not in his physical presence, he is in possession if he knows where it is, and he exercises control over it."). Constructive possession is evinced by the fact that Bankert knew of the presence of the cocaine, and he forcibly, with a gun, exerted dominion and control over the substance. *State v. Sizemore*, 115 N.M. 753, 756, 858 P.2d 420, 423 (Ct.App.), *cert. denied*, 115 N.M. 709, 858 P.2d 85 (1993); *Carr*, 95 N.M. at 764, 626 P.2d at 301. The predicate felony to Bankert's conviction of felony murder, thus stands.

### ISSUE TWO—SIMULTANEOUS POSSESSION OF COCAINE BY BUYER AND SELLER

Bankert also claims that jury instruction number ten, stating that "[t]wo or more people can have possession of a substance at the same time," and the prosecutor's related closing argument thwarted a jury determination of the possession element. He points out that no drug deal was ever consummated. "It is axiomatic," he says, "that during a drug transaction, a buyer and seller cannot each possess a controlled substance simultaneously."

At most, Bankert avows he is guilty of *attempted* possession. *See State v. Lopez*, 100 N.M. 291, 292, 669 P.2d 1086, 1087 (1983); *State v. Curry*, 107 N.M. 133, 135, 753 P.2d 1321, 1323 (Ct.App.) (holding that "the attempt to possess the cocaine can be inferred from defendant's attempt to pick up the package"), *cert. denied*, 107 N.M. 132, 753 P.2d 1320 (1988). Though he made the attempt, he never had the power of dominion and control over the substance, *see Sizemore*, 115 N.M. at 756, 858 P.2d at 423. The

threshold of a completed offense was never crossed. Thus, he argues, his felony murder conviction must fail, because the predicate felony—trafficking in cocaine—cannot be established.

The rules that govern commercial transactions do not apply to an illegal transaction. However, by proposing the "axiom" that a buyer and seller cannot simultaneously possess cocaine, Bankert is asserting a defense based on commercial contract theory. He suggests that both parties cannot have "legal possession of the same substance at the same time." But the law does not recognize contractual ownership of cocaine and so the concepts of "buyer" and "seller" are not operative. A contract which contravenes a rule of law is unenforceable. *Acacia Mut. Life Ins. Co. v. American Gen. Life Ins. Co.*, 111 N.M. 106, 107, 802 P.2d 11, 12 (1990) (citing *General Elec. Credit Corp. v. Tidenberg*, 78 N.M. 59, 62, 428 P.2d 33, 36 (1967)). The concepts of "buyer" and "seller" have meaning in the context of a drug deal only as indications of the direction of transfer.

In a commercial transaction, during preliminary negotiations, there can be no conclusive bargain. *See Restatement (Second) of Contracts* § 26 (1981). But in a drug deal, both buyer and seller can exert some control over the substance during negotiations. *See Bauske*, 86 N.M. at 485–86, 525 P.2d at 412–13 (citing *People v. Francis*, 71 Cal.2d 66, 75 Cal.Rptr. 199, 202, 450 P.2d 591, 594 (1969) (in bank)). By willingly exercising control at any point during the transaction, the parties have committed the illegal act of possession. The act cannot be undone, even if the physical transference of the drug later becomes impossible. In this case Smith provided the cocaine, Christison weighed it in her scales, and Bankert provided funds and transportation, and tried to enforce the sale with a gun. All three simultaneously took some control over the disposition of the cocaine; all three simultaneously were in possession.

### ISSUE THREE—THE PREDICATE FELONY WAS INHERENTLY DANGEROUS

NMSA 1978, Section 30–2–1(A)(2) (Repl.Pamp.1984) broadly sets forth the con-

cept of felony murder: "Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused ... in the commission of or attempt to commit any felony...." Bankert asserts that the felony of trafficking and possession of cocaine does not present the requisite mens rea for a conviction of first degree murder; it is not an inherently dangerous crime. This concern was addressed in *State v. Harrison*, 90 N.M. 439, 564 P.2d 1321 (1977). "In felony murder cases where the felony is a first-degree felony such a presumption is appropriate, but not where the felony is of a lesser degree." *Id.* at 442, 564 P.2d at 1324. *Harrison* adopted the "natural and probable consequences test." If the felony is one that "is inherently or foreseeably dangerous to human life," then the mens rea is sufficient for a conviction of felony murder. *Id.* This standard was further explained in *State v. Ortega*, 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991), which declared, "[T]here must be proof that the defendant intended to kill (or was knowingly heedless that death might result from his conduct)." (Emphasis omitted.) In his brief, Bankert all but ignored these well established standards.

In the present case the jury was instructed that it could find Bankert guilty of felony murder only if it found "[t]he defendant intended to cause the death of Robert Martin." It is irrelevant that, in the abstract, trafficking a controlled substance by possession with intent to distribute is not necessarily a dangerous crime. The standard applied to Bankert was that, while engaging in that particular felony, and as a consequence of that felony, he intended to kill Martin.

The conclusion that Bankert, before pulling the trigger, sought to kill Martin is strongly supported by the evidence. We may rely on inference from the facts to establish intent. *Muniz*, 110 N.M. at 800, 800 P.2d at 735. The murder was predicated by Bankert's mounting rage. He armed himself with the gun that he kept under the driver's seat of his car. At the very least he was, at this point, planning the threat, if not the use, of deadly force. Martin, acting as the negoti-

ator on behalf of Smith, was the logical object of Bankert's rage when he demanded to know if they wanted their money back. Saying, "I want it all!" Bankert jumped up and grabbed Martin around the neck so he could not speak. He intended to use force to close the deal, even after Hall attempted to stop him saying, "This is Bob's house. Bob's my friend. Leave him alone." Bankert's response was an express intent to kill: "I'll shoot you," implying, "I'll shoot you instead of Martin." He then pulled the trigger, an act preceded by a willful decision. The shot to the head at point blank range and again in the face was meant to kill. No mere warning or injury was intended. He then threatened Smith, asking him if he was ready to die; Bankert still planned murder. Only after being disarmed in a violent struggle did Bankert give up this plan. The conviction for the intentional killing of Martin is strongly supported by the facts.

## ISSUE FOUR—JURY INSTRUCTION ON SECOND DEGREE MURDER

In his fourth contention, Bankert says that the jury instruction setting forth the elements of second degree murder erroneously included a provocation element which was inherently confusing to the jury. Furthermore, the prosecution's closing argument that a finding of provocation would be illogical in this case was prejudicial. The instruction from SCRA 1986, 14-210, that second degree murder could be found only if "[t]he defendant did not act as a result of sufficient provocation," (footnote omitted) is appropriate only in cases where provocation is an issue. *Id.*, Use Note 1.

As Bankert admits, this error was not presented below. The parties were ordered by the trial judge to submit a complete set of jury instructions more than a month before the trial began. Bankert never objected to this instruction before the trial. It appears from the transcript that, at the time the judge read this instruction, he called the parties to the bench to discuss the appropriateness of the provocation language. Again, Bankert did not object.

Since this issue was not preserved below, the only mode of review open to Ban-

kert is that the instruction constituted fundamental error. SCRA 1986, 12–216(B)(2) (Repl.Pamp.1992); *State v. Escamilla*, 107 N.M. 510, 515, 760 P.2d 1276, 1281 (1988); *State v. Lucero*, 70 N.M. 268, 272, 372 P.2d 837, 840 (1962) ("Where substantial justice has been done, the parties must have taken and preserved exceptions in the lower court before this court will notice them on appeal."). Because we find the evidence overwhelmingly supports the conviction for intentional killing during the commission of a felony, even if the provocation instruction was inappropriate, elimination of that instruction would not have altered the jury's determination. We find in this jury instruction no miscarriage of justice, no deprivation of any rights essential to Bankert's defense, and nothing to "shock the conscience if the conviction were permitted to stand." *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991). Furthermore, the prosecution's closing argument was a fair assessment of the evidence on this issue. *See State v. Chamberlain*, 112 N.M. 723, 730, 819 P.2d 673, 680 (1991). There was no fundamental error and Bankert waived further review of this issue by failing to preserve it below. *State v. Osborne*, 111 N.M. 654, 661, 808 P.2d 624, 631 (1991).

## ISSUE FIVE—EVIDENCE OF CONSPIRACY

■ Bankert's fifth point is that the State presented insufficient evidence to support a conviction for conspiracy to possess a controlled substance with intent to distribute. This claim is effectively refuted by the facts. "A conspiracy is defined as a common design or agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means." *State v. Chavez*, 99 N.M. 609, 611, 661 P.2d 887, 889 (1983) (citing *State v. Thoreen*, 91 N.M. 624, 628, 578 P.2d 325, 329 (Ct.App.), *cert. denied*, 91 N.M. 610, 577 P.2d 1256 (1978)); *see also* NMSA 1978, § 30–28–2(A) (Repl.Pamp.1984) ("Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state."). A conspiracy can be established by an inference from circumstantial evidence. *State v. Davis*, 92 N.M. 341, 342, 587 P.2d 1352, 1353 (Ct.App.), *cert. denied*, 92 N.M. 353, 588 P.2d 554 (1978); *State*

*v. Armijo*, 90 N.M. 12, 14, 558 P.2d 1151, 1153 (Ct.App.1976).

From the afternoon of August 8 when Bankert and Christison ingested cocaine with Hall, to the final violent demand for all seven grams, Bankert was involved in nearly every act taken in furtherance of the conspiracy. There was, between the common-law husband and wife, a common design and a mutual agreement to obtain two eight-balls of cocaine. *See id.*

## ISSUE SIX—USE OF PRIOR CONVICTION OF ANOTHER PARTY TO THE CRIME

■ The final claim in this appeal is that the prosecutor made prejudicial remarks linking Bankert to a conspiracy with the already convicted Chester Smith. It is argued that these remarks were prejudicial, linking the presumably innocent Bankert to a convicted co-conspirator.

■ This issue was also not preserved below and introduces no fundamental error. Furthermore, the transcript shows that Bankert elicited testimony about Smith's guilt and made pointed remarks about Smith's conviction in his closing arguments. The doctrine of fundamental error cannot be invoked to remedy the defendant's own mistakes. *State v. Clark*, 108 N.M. 288, 295, 772 P.2d 322, 329 (finding no application of the doctrine of fundamental error "where the defendant by his own actions created the error"), *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989), *overruled on other grounds by State v. Henderson*, 109 N.M. 655, 664, 789 P.2d 603, 612 (1990). Smith's conviction was presented to the jury, not by the prosecution, but by Bankert himself.

## CONCLUSION

For the foregoing reasons, we affirm all the convictions below.

**IT IS SO ORDERED.**

MONTGOMERY, C.J., and BACA, J., concur.