928 P.2d 939

STATE Of New Mexico,
Plaintiff–Appellee,

v.

Robert CARRASCO, a/k/a Robert A. Carrasco, Roberto A. Carrasco, Robert J. Carrasco, and Roberto Carrasco, Defendant–Appellant.

No. 16470.

Court of Appeals of New Mexico.

Aug. 30, 1996.

Certiorari Granted Oct. 15, 1996.

T. Glenn Ellington, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

DONNELLY, Judge.

1. Our prior opinion filed on August 7, 1996, is withdrawn and the following is substituted therefor. Defendant appeals from a judgment and sentence entered following a jury trial, wherein he was found guilty of conspiracy to commit robbery, accessory to aggravated assault with intent to commit a violent felony, accessory to aggravated battery, accessory to attempted robbery, and accessory to false imprisonment. Four issues are presented on appeal: (1) whether his convictions are supported by substantial evidence; (2) claim of impermissible comment by the prosecutor on Defendant's right to remain silent; (3) claim of prosecutorial misconduct; and (4) whether the sentences violate Defendant's right against double jeopardy. We reverse and remand for a new trial.

## FACTS

2. On May 26, 1994, Defendant and two companions drove to Melrose, New Mexico, and stopped at the Allsup's Convenience Store. Defendant remained in the car while his two companions, Stephen Padron and Mario Moncayo, entered the store. Shortly following his entry into the store, Padron struck the sixty-two-year-old store clerk, Juanelle Gonzales, in the forehead with his fist, knocked her down, and kicked her. Moncayo attempted to open the cash register but was unsuccessful. The attempted robbery was aborted when a truck driver drove up and entered the store. Padron and Moncayo ran out of the store, jumped into the waiting car, and Defendant drove away.

3. Defendant and his two companions were arrested a short time later based on a description of the car and a description of Padron and Moncayo. Padron and Moncayo entered into plea agreements, and both testified against Defendant at his trial. Defen-

dant testified that he knew nothing of the acts of Padron and Moncayo, and that he was intoxicated and went to sleep and awoke in the car. He testified that after he awoke, he discovered that the car was parked outside the Allsup's store, that his two companions had gone inside the store, that shortly thereafter they came running out and jumped inside the car, and that he drove away. Although Defendant admits driving the car away from the store, he claimed that he first learned of the attempted robbery when his two companions told him of their acts while they were driving away.

## SUFFICIENCY OF THE EVIDENCE

■ 4. Defendant argues there is insufficient evidence to convict him of conspiracy to commit robbery and as an accomplice to the charges of aggravated assault with intent to commit a violent felony, aggravated battery, attempted robbery, and false imprisonment. In a criminal proceeding, when a defendant challenges the sufficiency of the evidence to support his convictions, we review such challenge in a light most favorable to the prosecution, resolving all conflicts and indulging in all permissible inferences, to determine whether a rational fact finder could have found beyond a reasonable doubt the essential facts required to convict Defendant of each of the charged offenses. *State v. Bankert,* 117 N.M. 614, 617–18, 875 P.2d 370, 373–74 (1994); *State v. Aguilar,* 117 N.M. 501, 504, 873 P.2d 247, 250, *cert. denied,* 513 U.S. 865, 115 S.Ct. 182, 130 L.Ed.2d 116, *and reh'g denied,* 513 U.S. 1034, 115 S.Ct. 621, 130 L.Ed.2d 529 (1994). Substantial evidence is defined as that evidence which a reasonable person would consider adequate to support a defendant's guilt. *State v. Sparks,* 102 N.M. 317, 320, 694 P.2d 1382, 1385 (Ct.App.1985).

■ 5. Our review of the record indicates that the jury could reasonably determine from the evidence presented at trial that Defendant was a co-conspirator in the crime of conspiracy to commit robbery, and an aider and abettor to each of the other charged offenses. Testimony presented at trial indicated that the car driven by Defendant on the evening of the attempted robbery was borrowed by him from his stepfather. Shortly before the attempted robbery, the car was parked away from the front of the store so that it was not visible from inside the building. Defendant testified that the car was difficult to start and that at the time Padron and Moncayo came running from the store, Defendant had the engine running. Defendant admitted driving the car away from the store immediately after his two companions exited from the store and entered the vehicle.

6. The store clerk testified that she was working the late shift alone on the evening of May 26, 1994, in the Allsup's store in Melrose. She stated she had gone outside to check the gas pumps and did not see any vehicle. As she reentered the store she saw two men, later identified as Padron and Moncayo, come around the corner of the building and go into the store. She stated Padron hit her, and Moncayo attempted to open the cash register. She stated she did not detect any odor of alcohol on the two men.

7. A truck driver, Donnie Danford, drove up while the attempted robbery was in progress. He testified that when he got out of his truck he observed two men running from the store and moments later heard a vehicle with loud tailpipes leaving the scene. When he went into the store, he found the store clerk who had been injured.

8. Based on a description of the car and the two men who had entered the store, Deputy Sheriff Sandy Loomis stopped the car driven by Defendant and arrested Defendant and his two companions. The store clerk identified Padron and Moncayo as the two men who had attempted to rob the store.

9. At trial Defendant testified as the sole defense witness. He denied any knowledge of the robbery or the other criminal acts committed by Padron and Moncayo. He further testified that he became cold and started the car in order to operate the heater. According to Defendant, moments after he started the car, Padron and Moncayo came out of the store and, thereafter, he drove away. He admitted that after they left the store Padron told him that he had hit the store clerk and that Moncayo said he had tried to open the cash register to take the

money. Defendant also stated that after he drove away from the store, Padron showed him his bloody hands and said he needed to stop and clean them.

10. Defendant admitted that he had previously worked as a store clerk for five to six months at an Allsup's, that he had worked the late shift, and that he was familiar with the duties of a store night clerk. Although Defendant claimed he was intoxicated and was asleep when Padron and Moncayo entered the store, Deputy Sheriffs Roger Hatcher and Loomis testified that when they apprehended the three individuals they did not appear intoxicated. Similarly, Nancy Fitzmartin, the booking officer, stated that the three men did not exhibit any signs of intoxication when they were taken to the Curry County Adult Detention Center.

11. Both Padron and Moncayo entered into plea bargains and testified at Defendant's trial. Padron admitted attempting to rob the store, but claimed he could not remember specific details of that night's events. He did testify that Defendant drove the car away from the store. Moncayo testified that on the evening in question he had been drinking and could not recall what transpired.

12. Despite the lack of direct eyewitness testimony linking Defendant to the attempted robbery, we conclude that viewing all of the evidence in a light most favorable to the State, the jury could reasonably determine from the evidence presented at trial that Defendant was guilty of conspiracy to commit robbery, accessory to aggravated assault with intent to commit a violent felony, accessory to aggravated battery, accessory to attempted robbery, and accessory to false imprisonment. The jury in its role as fact finder could properly evaluate Defendant's credibility and the weight to be given to his testimony. *See* NMUJI 1996, 14–5020 (jury sole judges of credibility of witnesses and weight to be given to their testimony).

■ 13. The legislature, by enactment of NMSA 1953, Repl.Vol. 6 (1964), Section 40A–1–14, as subsequently amended and now designated as NMSA 1978, Section 30–1–13 (Repl.Pamp.1994), abolished the common-law distinction between a principal and an acces-

sory. *State v. Nance,* 77 N.M. 39, 45, 419 P.2d 242, 246 (1966), *cert. denied,* 386 U.S. 1039, 87 S.Ct. 1495, 18 L.Ed.2d 605 (1967). A defendant may be convicted as an accessory by reason of his aiding and abetting in the commission of a crime or crimes even though the principal who directly committed such crime has not been prosecuted or convicted. Section 30–1–13. Additionally, a defendant may be found guilty if the defendant helped, encouraged or caused the crime to be committed, or made it known that the commission of an offense already undertaken had the aider's support and approval. NMUJI 1996, 14–2822; *see also Bankert,* 117 N.M. at 619, 875 P.2d at 375 (intent and accomplice liability may be proven by inference from surrounding facts and circumstances); *State v. Gonzales,* 82 N.M. 388, 392, 482 P.2d 252, 256 (Ct.App.) (proof of "[a]iding and abetting is established by evidence of a community of purpose; a shared criminal intent in the unlawful undertaking"), *cert. denied,* 82 N.M. 377, 482 P.2d 241 (1971). As observed in *State v. Riley,* 82 N.M. 298, 299, 480 P.2d 693, 694 (Ct.App.1971) (quoting *State v. Ochoa,* 41 N.M. 589, 72 P.2d 609 (1937)), " '[t]he question of whether the alleged aider and abettor did share the principal's criminal intent, and whether he knew the latter acted with criminal intent, is one of fact for the jury and may be inferred from circumstances.' " *See also State v. Johnston,* 98 N.M. 92, 95, 645 P.2d 448, 451 (Ct.App.) (proof of conspiracy may be established by reasonable inferences arising from defendant's conduct), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982); *State v. Sheets,* 96 N.M. 75, 78, 628 P.2d 320, 323 (Ct.App.) (same), *cert. quashed,* 96 N.M. 116, 628 P.2d 686 (1981).

14. Evidence was introduced at trial from which the jury could reasonably determine that Defendant's role in the alleged criminal activity was to remain outside in the car, with the engine running, in order to facilitate a fast getaway after the others had robbed the store. Defendant admitted driving the car away from the store. The State presented evidence that the car driven by Defendant had been parked in a location where it could not been seen from inside the store, and that

after Defendant's two companions ran from the store, the car was quickly driven away from the area. The truck driver, Danford, testified he believed the car which he saw exit the store parking lot was running when the two men ran from the store, because the car took off so fast. On cross-examination, Defendant testified that he drove the car away from the store after Padron and Moncayo came out because he "figured they had done what they had to do." This evidence was sufficient to support a reasonable inference that Defendant shared a community of purpose with Padron and Moncayo in the criminal enterprise of planning and carrying out the acts leading to the attempted robbery of the store.

15. Defendant's act of driving the car away from the scene of the attempted robbery moments after his two companions fled from the store provided a basis from which a reasonable inference could properly be drawn indicating that Defendant was a knowing participant in the attempted robbery. *See State v. Padilla,* 118 N.M. 189, 192–93, 879 P.2d 1208, 1211–12 (Ct.App.) (evidence of defendant's act of driving getaway car quickly from robbery scene supported defendant's conviction for conspiracy to commit armed robbery and aiding and abetting a robbery), *certs. denied,* 117 N.M. 802, 877 P.2d 1105 (1994); *State v. Paul,* 82 N.M. 619, 622–23, 485 P.2d 375, 378–79 (Ct.App.) (evidence connecting defendant with robbery, although circumstantial, held sufficient to support robbery conviction), *cert. denied,* 82 N.M. 601, 485 P.2d 357 (1971).

■ 16. Defendant argues that even if the Court finds there is sufficient evidence to support his convictions of conspiracy and attempted robbery, nevertheless, there is insufficient evidence to support his convictions of aggravated battery and false imprisonment of the store clerk. We disagree. While Defendant remained in the car and did not directly participate in the false imprisonment and the beating of the store clerk, the jury could reasonably determine from the evidence presented that he was an accessory to the false imprisonment and the aggravated beating of the store clerk. Evidence that Defendant aided and abetted Padron and Moncayo in the attempt to rob the store by procuring and driving the getaway vehicle also allowed a reasonable inference that he encouraged and aided in the commission of the false imprisonment and aggravated battery on the store clerk during the attempted robbery.

17. In addition, as noted above, Defendant testified on cross-examination that he drove the car away from the store after Padron and Moncayo came out because he "figured they had done what they had to do." This comment could reasonably be interpreted as an indication that Defendant consented to Padron and Moncayo engaging in whatever conduct "they had to" or whatever conduct they deemed necessary to complete the robbery. Accordingly, the jury could reasonably infer, under the instructions given, that Defendant intended that the false imprisonment and aggravated battery on the store clerk be committed to accomplish the robbery. *Cf. State v. O'Dell,* 85 N.M. 536, 537, 514 P.2d 55, 56 (Ct.App.1973) (defendant's conviction as accessory to robbery upheld despite his claim that he did not know of robbery until after its commission, where evidence demonstrated that he approved of the robbery and shared the principal's intent).

18. This is consistent with the approach taken by other jurisdictions where this issue has arisen under similar factual scenarios. Other courts have held that an accessory to the offense of attempted robbery may be liable for criminal acts of a confederate, including aggravated battery, which are committed during a robbery attempt if such criminal acts were the natural and probable consequence of the attempted criminal offense. *See People v. Beeman,* 35 Cal.3d 547, 199 Cal.Rptr. 60, 68, 674 P.2d 1318, 1326 (1984) (en banc) ("The liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages."); *Harris v. State,* 425 N.E.2d 154, 156 (Ind.1981) (accomplice may be held criminally liable for acts of confederates that were a probable and natural consequence of their common plan); 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.8(b) (1986) (an accomplice may be liable

for other criminal acts of the principal that were a "natural and probable consequence").

19. Similarly, other courts have held that an aider and abettor may be held criminally liable not only for the predicate crime, but for any other crime which is the probable and natural consequence of a criminal act encouraged or facilitated by the aider and abettor. *People v. Nguyen,* 21 Cal.App.4th 518, 26 Cal.Rptr.2d 323, 330 (1993), *review denied* (Mar. 31, 1994). As observed by the court in *Nguyen:*

> "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator."

*Id.* (quoting *People v. Croy,* 41 Cal.3d 1, 221 Cal.Rptr. 592, 597, 710 P.2d 392, 398 n. 5 (1985) (en banc)).

20. Proof of aiding and abetting may be established by evidence that the defendant joined with others in a community of purpose and a shared criminal intent in the unlawful undertaking. *Gonzales,* 82 N.M. at 392, 482 P.2d at 256; *see also State v. Duran,* 86 N.M. 594, 595, 526 P.2d 188, 189 (Ct.App.) ("Aiding and abetting may be shown by evidence of acts, conduct, words, signs or any means sufficient to incite, encourage or instigate commission of the offense."), *cert. denied,* 86 N.M. 593, 526 P.2d 187 (1974).

21. Based upon our review of the record, we conclude that the evidence presented at trial was sufficient to permit the jury to find, under the instructions given, that Defendant aided and abetted his two companions in perpetrating each of the charged offenses.

## COMMENT ON DEFENDANT'S SILENCE

22. During the State's case-in-chief, the prosecutor asked the arresting officers whether they had sought to question Defendant after he had been booked and placed in jail. The officers testified that, after being booked into the jail, Defendant had been read his *Miranda* rights, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that he read and signed an advice of rights form, but that he had refused to talk to them and stated that he only wanted to "deal" with the district attorney.

23. Following the presentation of his direct testimony, Defendant underwent vigorous cross-examination. The prosecutor questioned Defendant concerning certain remarks he had made following his arrest, as follows:

Q: This story you told us today, is the very first time that you ever told this story in public or to anybody in this room other than I assume your attorney, is that correct?

A: That's correct.

Q: You never told the officers that night?

A: No.

Q: You never told, never spoke, never had your attorney come to the district attorney's office, never told anyone else, you never told any deputy, jailer, anyone, this? This is the very first time you ever told this story. Isn't that true?

A: Yes.

24. The prosecutor then inquired of Defendant whether he heard the two arresting officers testify that he had declined to talk to them and that he told them he would only talk to the district attorney about making a "deal." This inquiry was followed by a question which asked, "Why didn't you tell the officers what was going on at that time?" Defendant responded that he believed the district attorney had greater authority to assist him with his release. Following this response, the prosecutor then stated, "So you wait until the day you come to court for the first time and tell us this story, is that correct?" Defendant responded, "Yes, sir."

25. The prosecutor also questioned Defendant concerning his silence immediately following arrest. The prosecutor asked: "When you saw that police car, why didn't you get out and say, 'Hey, there's a problem here with these two guys? These guys tried to rob the Allsup's. They told me?'" Defendant responded that he first learned about

the attempted robbery a few minutes before his car was stopped by the police and that it did not occur to him to make such statement while the deputy's pistol was pointed at him.

26. Thereafter, the prosecutor stated, "Well, I assume that if you didn't do anything, that the first thing you want to do ... is say to the police, 'It's not me, it's those two guys. These are the two that tried to rob the Allsup's.'" The prosecutor then continued: "So, once [the officer] makes a felony arrest on all three of you, wouldn't that be a good time for you to say to him, 'Hey, let me tell you what they told me.' Why didn't you tell him then? Why didn't you tell the deputy then?"

27. When Defendant requested clarification as to what time the prosecutor was referring to, the prosecutor stated, "I'm talking about after you'd been handcuffed." Defendant was again asked why he did not tell the police what happened, and why he did not tell Deputy Loomis, one of the arresting officers, at that time what had happened and why he "didn't say to him, 'Mr. Padron's the one with the bloody knuckles, he's the guy to talk to?'"

28. The prosecutor further pursued this line of inquiry by asking Defendant why he did not make a statement explaining his innocence when he was driven to the hospital by law enforcement officers to see if the store clerk could identify him or his two companions. The prosecutor stated that "you had information at that time that your co-defendants, the two guys you were with, had been involved in this robbery" and "did you ever think that would be a good time to tell us this story that we hear for the first time today? Wouldn't that have been a good time to tell it?" Defendant answered, "I'm sure it would have been but I didn't tell."

29. Defendant was also questioned on cross-examination regarding how many times he had met with defense counsel prior to trial and whether he was informed by his attorney that he had the "luxury" of sitting at the defense table during trial and listening to the other witnesses. Defense counsel objected to the term "luxury" and the trial court instructed the prosecutor to rephrase his question. Thereafter, the prosecutor asked,

"You've exercised your right to sit at the table and hear everybody testify before you told your story, correct?"

30. Defense counsel did not object to the prosecutor's comments on Defendant's post-arrest silence. However, on redirect, defense counsel asked Defendant to read the *Miranda* warning relating to his right to remain silent, and asked him if he had exercised that constitutional right until testifying at trial. Defendant responded in the affirmative. On recross, the prosecutor asked Defendant whether, instead of relying on his right to silence, he had asked to speak to the district attorney.

31. In closing argument the prosecutor told the jury that Defendant's testimony was not credible and emphasized that he had not previously told law enforcement officers the "story" that he testified to at trial. Defense counsel did not voice any objection to the prosecutor's comments during closing argument.

32. Defendant argues on appeal that the prosecutor's repeated questioning of Defendant concerning why he had not previously told anyone about his lack of knowledge about the attempted robbery by his companions constituted error because it was an impermissible comment on Defendant's constitutional right to remain silent. We agree.

33. In *State v. Hennessy*, 114 N.M. 283, 285, 837 P.2d 1366, 1368 (Ct.App.), *cert. denied*, 114 N.M. 82, 835 P.2d 80 (1992), this Court, relying on *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and *State v. Miller*, 76 N.M. 62, 412 P.2d 240 (1966), reiterated the rule that direct prosecutorial comment at trial on a defendant's post-arrest right to remain silent constitutes reversible error. In *Griffin* the United States Supreme Court held that a prosecutor is not permitted to comment on a defendant's exercise of his right to remain silent. The *Hennessy* Court observed that questions propounded by a prosecutor pertaining to the defendant's post-arrest silence are improper, that they constitute fundamental error, and that "[t]his [C]ourt and our [S]upreme [C]ourt have repeatedly disapproved [prosecutorial statements on a defen-

dant's silence] and have held that prosecutorial comments on the right to remain silent warrant reversal, *whether objected to or not.*" *Id.* at 286, 837 P.2d at 1369 (emphasis added).

34. Similarly, our Supreme Court, in *State v. Ramirez*, 98 N.M. 268, 269, 648 P.2d 307, 308 (1982), held:

> The Court of Appeals in *State v. Lara*, [88 N.M. 233, 234, 539 P.2d 623, 624 (Ct.App. 1975)], held that any reference to the defendant's silence had an intolerable prejudicial impact that would require a new trial. In *State v. Baca*, 89 N.M. 204, 549 P.2d 282 (1976), we limited *State v. Lara*, *supra*, to those times when the prosecutor is directly responsible for the improper comment on the defendant's silence. (*Baca* involved the unsolicited statements of a policeman witness). [Emphasis in original omitted.]
>
> In the present case [the prosecutor] commented directly on [the defendant's] silence in his closing argument to the jury in violation of the fifth amendment. Under both *Lara* and *Baca* such a comment by the prosecutor constitutes fundamental error and mandates a new trial.

35. In *State v. Martin*, 101 N.M. 595, 600, 686 P.2d 937, 942 (1984), our Supreme Court again addressed the propriety of prosecutorial questioning concerning a defendant's post-arrest silence and stated:

> [T]he prosecutor directly commented on defendant's post-*Miranda*, post-arrest silence when he asked, "[I]sn't it a fact that you didn't tell them [your family] anything so that I couldn't learn about it [your story] in October when I called them to the witness stand?" *This statement alone constitutes grounds for reversal of defendant's conviction. State v. Ramirez*, 98 N.M. 268, 648 P.2d 307 (1982); *State v. Lara*, 88 N.M. 233, 539 P.2d 623 (Ct.App. 1975). [Emphasis added.]

36. The State argues that *Hennessy, Baca*, and their progeny are not controlling here because Defendant waived his right to remain silent following his arrest, that the statements made by him while he was in custody were voluntary in nature, and that the State's cross-examination covered matters largely dealt with during Defendant's direct examination.

37. The record does not indicate that Defendant was advised of his *Miranda* rights immediately following his arrest. *See State v. Garcia*, 118 N.M. 773, 777, 887 P.2d 767, 771 (Ct.App.1994) (holding burden on state to show when *Miranda* warnings were given), *cert. denied*, 119 N.M. 168, 889 P.2d 203 (1995). After being arrested, Defendant and his two companions were driven to the hospital to see if they could be identified by Ms. Gonzales, the store clerk. Thereafter, Defendant was taken to jail and booked. At this time, Defendant was read his *Miranda* rights and the arresting officers sought to interrogate him. Defendant declined to talk to the deputies and stated, "You get your DA over here and I'll see what kind of deal he wants to cut with me and then I will decide whether I want to talk to you or not." We agree that questioning at trial about Defendant's behavior and attitude following his arrest (as opposed to Defendant's failure to come forward with his story) did not constitute a direct comment on his post-arrest right to remain silent. We also agree that cross-examination concerning Defendant's comment to the deputies following the reading of his *Miranda* rights to the effect that he might talk to the district attorney was proper. *See State v. Hamilton*, 89 N.M. 746, 748–49, 557 P.2d 1095, 1097–98 (1976).

38. In *Hamilton* the defendant said that he did not want to talk to a particular police officer. That police officer subsequently testified at trial that the defendant declined to give any statement to her. The defendant later confessed to another officer, and the Court in *Hamilton* held that the defendant's refusal to talk to the first officer did not amount to an invocation of his right to remain silent. Thus, the defendant's subsequent statement given to another officer could properly be admitted into evidence. *Id.*

39. A single statement volunteered by a defendant following arrest, however, does not mean that the defendant has automatically waived his or her right to remain silent or the right to remain free from com-

ment on his or her post-arrest silence. *See Hennessy*, 114 N.M. at 288, 837 P.2d at 1371; *see also Miranda*, 384 U.S. at 475–76, 86 S.Ct. at 1628 ("[T]here is no room for the contention that the privilege [against self-incrimination] is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent."). To the extent that the prosecutor, at trial, questioned Defendant about his silence following his arrest, such questioning clearly constituted a direct comment on Defendant's constitutional right to remain silent. Apart from inquiry on Defendant's statement that he might "deal" with the district attorney, specific questioning by the prosecutor asking Defendant why he had waited until trial to assert his innocence or to tell his version of the events preceding his arrest amounted to a direct, impermissible comment on Defendant's Fifth Amendment right to post-arrest silence. *Baca*, 89 N.M. at 205, 549 P.2d at 283 (prosecutorial questioning concerning defendant's silence after arrest held prejudicial and requires reversal under plain error rule); *see also Ramirez*, 98 N.M. at 269, 648 P.2d at 308 (comment by prosecutor on defendant's post-arrest silence held to be plain error and such error is not waived by failure to object).

40. We have carefully reviewed each of the State's reasons seeking to distinguish the rule proscribing direct prosecutorial comment on a defendant's post-arrest silence from the facts of the present case, including the claim that cross-examination on these matters was in response to matters elicited by the defense on direct examination, and find them unpersuasive.

41. We believe prosecutorial questioning of Defendant concerning his decision to exercise his right to "sit at [counsel] table and hear everybody testify before [he] told his story" was also improper. Defendant's right to appear and testify in his own behalf is a fundamental, constitutional right. *See* N.M. Const. art. II, § 14 ("In all criminal prosecutions, the accused shall have the right to appear and defend himself in person...."). The order of trial, including the time Defendant may exercise his right to testify in his own defense, is governed by

Supreme Court rule. NMRA 1996, 5–607. Any suggestion that Defendant's exercise of these rights or his timing of his right to testify in his own defense was inappropriate and falls outside the parameters of permissible comment or questioning. *Cf. Garcia v. State*, 103 N.M. 713, 714, 712 P.2d 1375, 1376 (1986) (prosecutor's comment on defendant's exercise of constitutional right to deny warrantless search of vehicle held reversible error); *Martin*, 101 N.M. at 600, 686 P.2d at 942 (comment by prosecutor that defendant failed to previously reveal theory of defense held "highly improper").

42. Because we find this issue dispositive, we need not address the other points raised by Defendant on appeal.

*CONCLUSION*

43. For the reasons discussed herein, Defendant's convictions are reversed and the cause is remanded to the trial court for a new trial.

44. IT IS SO ORDERED.

BOSSON and WECHSLER, JJ., concur.