887 P.2d 767

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jose A. GARCIA, Defendant–Appellant.**

**No. 15008.**

Court of Appeals of New Mexico.

Nov. 14, 1994.

Certiorari Denied Feb. 2, 1995.

Tom Udall, Atty. Gen., Ann M. Harvey, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, David Henderson, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

HARTZ, Judge.

Defendant was convicted by a jury of armed robbery and aggravated assault. His sole claim on appeal is that the prosecution improperly used his postarrest silence as evidence against him. We agree and reverse the convictions.

## I. BACKGROUND

Defendant presented an alibi defense. There was no dispute that the crimes charged had been committed by someone. On the evening of December 19, 1991, a woman was robbed of her purse at gunpoint

in the parking lot of the SuperSave grocery store in Española, New Mexico. While fleeing, the robber fired his gun at a pursuing witness. The robber was not apprehended that evening. An employee of the store told an investigating officer that he had seen Defendant behind the store a few minutes before the robbery. Subsequently, Defendant was arrested at his brother's home in Questa. Española police detective Johnny Vigil transported Defendant back to Española.

At trial Defendant admitted that he had been at the SuperSave during the evening of the robbery. He explained, however, that he was merely accompanying a friend, Leonard Padilla, who had gone to the store to buy dog food. According to Defendant, after Padilla made his purchase the two left in Padilla's truck. Padilla corroborated this account at trial, although he was not certain of the exact date.

Defendant complains of the following questioning of Detective Vigil by the prosecutor during the State's case in chief:

PROSECUTOR: Now when—what kind of papers were served on [Defendant] when he was arrested or when you picked him up in terms of advising him of the charges?

VIGIL: He was given a copy of the arrest warrant and the affidavit.

PROSECUTOR: *Okay. And how long did you spend with [Defendant] on the 26th?*

VIGIL: Travelled up to Taos, spoke to some of the deputies that had picked him up in Questa, then we travelled back to Española.

PROSECUTOR: Okay. And how long does it take to travel back from Taos to Española?

VIGIL: It's probably a 45–minute drive.

PROSECUTOR: Okay. And did you also participate in booking [Defendant]?

VIGIL: Yes, I did.

PROSECUTOR: About how long did that take?

VIGIL: Probably about 10 minutes.

PROSECUTOR: What next steps did you take in the investigation?

VIGIL: What I did is I went ahead and took [Defendant's] boots—

PROSECUTOR: Why did you do that?

VIGIL: —the evening of his arrest. I had been told by Officer Jesse Marquez that while he was attempting to catch up to a possible suspect headed in a northerly direction from SuperSave he had seen some waffle type shoe prints headed in a northerly direction from SuperSave as it had snowed during that particular time of the year. The boots or shoes that [Defendant] had on at the time of his arrest had some waffle-type shoe prints on it.

PROSECUTOR: Were you ever able to locate the prints that Officer Marquez had mentioned to you?

VIGIL: No.

PROSECUTOR: Okay. What else did you do then next?

VIGIL: I sent this evidence that I had to the crime lab for analysis.

PROSECUTOR: Okay. Have you—how many cases have you worked in your nine and a half years with the Española Police Department? Can you give an estimate? Say major—major crimes as opposed to maybe when you were on patrol and doing traffic and stuff, but major cases.

VIGIL: I would have to say a substantial number of cases.

PROSECUTOR: More than 100?

VIGIL: That's probably a close estimate.

PROSECUTOR: Okay. While investigating those cases, *have you ever arrested a suspect who indicated to you that he had an alibi* for the time of the crime?

VIGIL: Yes.

PROSECUTOR: And what did you do *when a suspect said he had an alibi?* What is your responsibility then?

VIGIL: If an individual says he has an alibi it would be my responsibility or an investigator's responsibility to check it out and see if in fact it is true or not true.

PROSECUTOR: Have you ever had the occasion to check out an alibi on a sus-

pect that you've already arrested and found that the alibi checked out?

VIGIL: Yes.

PROSECUTOR: And then what's your responsibility?

VIGIL: To share that information with the district attorney.

PROSECUTOR: Has that ever resulted in the suspect then being freed, let go, cleared?

VIGIL: I would have to say that's happened on at least a couple of occasions.

PROSECUTOR: Okay. *When was the first time you learned that there was an alleged alibi for Jose Garcia in this incident?*

VIGIL: The first time I learned was I think it was back in August of 92 when this case came to trial. (Emphasis added.)

After the prosecutor asked one more question and received an answer, defense counsel asked to approach the bench, where he moved for a mistrial on the ground that the prosecutor had commented upon Defendant's exercise of his right to remain silent. The prosecutor responded as follows:

Your Honor, I haven't asked him anything about what the defendant said or didn't say. It is a fact that the first time he heard about [inaudible] was in August. The case law is quite clear that there is a difference between commenting on a person's right to remain silent and commenting on recent fabrication, especially when it would be natural under the circumstances to make a statement to disclaim something. It was the defendant's choice to raise his defense as having an alibi.

After further argument by defense counsel, the prosecutor continued:

I haven't commented on the defendant. There's another source for mentioning the alibi, and that's Leonard Padilla, who could have gone to the officer.

The district court asked defense counsel if an instruction to the jury would cure any prejudice. Defense counsel replied that any instruction would be inadequate. The court denied the motion for a mistrial and instructed the jury as follows:

The jury is instructed, if it heard or ascertained anything in the witness's last answer, and it was a fairly long—the question wasn't as long as the answer was narrative—but, anything that may have been heard or not as to anything Mr. Garcia, the Defendant, said or didn't say at the time of his fingerprinting or booking, and any comment by the officer at that time will be stricken and disregarded, if any you heard—there's some dispute and we're going to listen to the tape as to what may have been said—but, it's not appropriate evidence at this time and will not be considered by the jury if you did hear and understand either what Mr. Garcia said or didn't say or was said to have said or not say, or what the Sergeant said at that time. You may proceed.

At the close of the State's case Defendant unsuccessfully renewed his motion for a mistrial.

## II. DISCUSSION

### A. Postarrest Silence Distinguished From Post–*Miranda* Silence

Evidence of a defendant's postarrest silence is generally inadmissible because the probative value of the silence is substantially outweighed by the potential for unfair prejudice. *See, e.g., United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *State v. Baca*, 89 N.M. 204, 549 P.2d 282 (1976); SCRA 1986, 11–403 (Repl.1994).

◼ In addition, when the silence came after the defendant received the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a second reason supports exclusion of the evidence. As the Supreme Court of the United States stated in *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976):

[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested per-

son's silence to be used to impeach an explanation subsequently offered at trial. *Doyle* was not predicated on the probativeness, or lack thereof, of postarrest silence. On the contrary, the Supreme Court has held that when *Miranda* warnings were not given, there is no federal constitutional prohibition on use of evidence of postarrest silence. In *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) (per curiam), the Court wrote:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

A third possible reason for excluding evidence of postarrest silence was suggested in *State v. Ramirez*, 98 N.M. 268, 269, 648 P.2d 307, 308 (1982), in which the New Mexico Supreme Court indicated that prosecutorial comment on a defendant's silence may violate New Mexico's rule of evidence SCRA 1986, 11–513(A) (Repl.1994), which forbids comment on any claim of privilege. The decision, however, may rest more particularly on the fact that the silence referred to by the comment in that case encompassed the defendant's failure to testify at trial. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Constitution forbids comment on defendant's failure to testify at trial). Subsequent to *Ramirez*, in *State v. Martin*, 101 N.M. 595, 600, 686 P.2d 937, 942 (1984), our Supreme Court noted that *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), held that prearrest silence may be admissible for impeachment purposes.

One cannot readily determine from our precedents whether New Mexico law treats the prosecution's use of a defendant's postarrest silence differently depending upon whether the defendant received *Miranda* warnings. Although the United States Constitution presents no impediment to the use of postarrest silence when the defendant did not receive *Miranda* warnings, our state's rules of evidence may bar the use of silence after an arrest not accompanied by *Miranda* warnings to the same extent that constitutional due process would bar the use of such silence if *Miranda* warnings had been given.

We need not decide that question. For the purposes of this appeal, we assume that the same standard of review applies regardless of whether Defendant received *Miranda* warnings. Given the nearly twenty-year-old line of New Mexico cases that disapprove of prosecutorial use of postarrest silence, *see State v. Hennessy*, 114 N.M. 283, 285–86, 837 P.2d 1366, 1368–69 (Ct.App.), *cert. denied,* 114 N.M. 82, 835 P.2d 80 (1992), if the State wished to argue that a different standard should apply in the absence of *Miranda* warnings, then, as the proponent of the impeachment evidence, it had the burden to raise that issue and make a factual showing that Defendant received no *Miranda* warnings. Yet, the State failed to raise the issue at trial. Therefore, we deem it inappropriate to remand to the district court for a finding on whether *Miranda* warnings were given.

## B. Application to This Case

■ We begin with the proposition that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245. The State contends that the testimony quoted above was not used for such a purpose. We disagree.

The clear import of the questioning was to point out that (1) innocent suspects with alibis may, and do, disclose their alibis to officers at the time of arrest, (2) Defendant had been with Detective Vigil for approximately an hour after the arrest, and (3) Defendant made no mention of his alibi during that period of time, or for a significant period of time thereafter. The prosecutor revealed her purpose in the questioning in her first response to Defendant's motion for a mistrial. She stated: "[T]here is a difference between commenting on a person's right to

remain silent and commenting on recent fabrication, especially when it would be natural under the circumstances to make a statement to disclaim something. It was the defendant's choice to raise his defense as having an alibi." The prosecutor undoubtedly believed that it was proper to use Defendant's silence after his arrest as evidence that his alibi defense was a recent fabrication. She was incorrect in her understanding of the law. Using silence to impeach an alibi would be "to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* Here, the silence was used to impeach the alibi "explanation" that was offered at trial. *See State v. Romero,* 94 N.M. 300, 301, 609 P.2d 1256, 1257 (Ct.App.1980).

The State contends that the purpose of Vigil's testimony was to discredit the alibi witness, Leonard Padilla. It cites *State v. Calvillo,* 110 N.M. 114, 118–19, 792 P.2d 1157, 1161–62 (Ct.App.), *cert. denied,* 110 N.M. 72, 792 P.2d 49 (1990), as authority for the propriety of challenging Padilla's failure to come forward earlier with his alibi testimony. To be sure, during the bench conference after Defendant's mistrial motion the prosecutor suggested that she was attacking the alibi witness. But the questioning of Detective Vigil made no mention of Padilla, nor did the context of the questioning suggest that its purpose was to challenge Padilla. On the contrary, the questions asked whether Vigil had known of a "suspect" to come forward with an alibi.

Likewise, we reject the State's contention on appeal that the purpose of the line of questioning of Detective Vigil was to explain why the officer had not looked into the alibi at the time of his investigation. Not only does this explanation fail to account for the questions regarding how long Vigil was with Defendant or the questions relating to whether suspects reveal their alibis, but it is also inconsistent with the prosecutor's explanation at trial. Moreover, the State does not point to any occasion in the record when the defense argued that the State had failed to investigate the alibi properly. There was simply no need to point out that the State did not know of the alibi defense until long after

the crime was committed. The manifest intent of the questioning, and its natural impact on the jury, was to suggest that Defendant's postarrest silence was inconsistent with his alibi defense. *See State v. Isiah,* 109 N.M. 21, 24, 781 P.2d 293, 296 (1989).

■ The State also contends that Defendant opened the door to the subject by asserting an alibi defense in the opening statement to the jury. This argument, however, would completely undercut *Doyle. Doyle* forbids the use of post–*Miranda* silence to impeach an explanation offered at trial. *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245. There is nothing to impeach until the defense has come forward with an explanation. By the State's reasoning, offering an explanation would always open the door for the impeachment. We reject the State's argument. The essence of *Doyle* is that it is fundamentally unfair to assure a suspect that silence will carry no penalty and then, when the suspect offers an explanation at trial, suggest to the jury that anyone with that explanation would naturally have offered it at the time of arrest. In this case the prosecution made just that suggestion. *Cf. id.* at 619–20 n. 11, 96 S.Ct. at 2245 n. 11 (evidence of defendant's postarrest silence could be used to impeach defendant's testimony that he told police the exculpatory story at the time of his arrest).

■ Next, the State argues that any error was cured by the instruction to the jury by the district court. We disagree. The instruction was too vague to inform the jury of its duty. Indeed, the vagueness was probably intentional, because any direct comment on Defendant's postarrest silence posed the risk of emphasizing the matter to the jury. Perhaps Defendant had a duty to proffer the best possible curative instruction and we should therefore assume that such an instruction was given. But such an assumption would not alter the result here. In general, an instruction is unlikely to eliminate the risk that the jury will consider a defendant's post–*Miranda* silence to be inconsistent with the defendant's trial testimony. *Cf. Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (instruction to disregard question cured error; because objection to question was sustained before it

was answered, there was no evidence of post-arrest silence). New Mexico opinions have held that prosecutorial use of postarrest silence is plain or fundamental error requiring reversal even in the absence of a defense objection at trial. *See, e.g., Romero,* 94 N.M. at 301–02, 609 P.2d at 1257–58. These opinions reflect the view that the use of postarrest silence is profoundly unfair and prejudicial. Such prejudice would ordinarily not be curable by an instruction. *Cf. State v. Lamure,* 115 N.M. 61, 68, 846 P.2d 1070, 1077 (Ct.App.1992) (court will not find fundamental error when timely objection could have cured prejudice). Other courts have held that an instruction to the jury will not in itself cure a *Doyle* error. *See Morgan v. Hall,* 569 F.2d 1161, 1168 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); *Dorman v. State,* 622 P.2d 448, 458 (Alaska 1981); *Commonwealth v. Hudson,* 26 Mass.App.Ct. 936, 525 N.E.2d 447, 448 (1988).

■ That is not to say that the giving of a curative instruction is irrelevant. A *Doyle* error does not require reversal of a conviction on direct appeal if the error was harmless beyond a reasonable doubt. *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). A cura-tive instruction is a factor in determining whether *Doyle* error was harmless. *See Bass v. Nix,* 909 F.2d 297, 305 (8th Cir.1990). Here, however, neither the instruction given, nor any more explicit instruction, would have sufficed to save the verdict. After the State rested its case the district court commented that the case was "very close" and the jury seemed "evenly balanced." We note that at the first trial of Defendant on these charges the jury was unable to reach a verdict. In this setting we are unwilling to hold that the error was harmless beyond a reasonable doubt.

## III. CONCLUSION

For the above reasons we reverse Defendant's convictions and remand for a new trial.

IT IS SO ORDERED.

MINZNER, C.J., and BOSSON, J., concur.