2007-NMSC-033

162 P.3d 156

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Peter P. GUTIERREZ, Defendant–Petitioner.**

**No. 29,286.**

Supreme Court of New Mexico.

June 13, 2007.

John Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Gary K. King, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, NM, for Respondent.

**OPINION**

SERNA, Justice.

{1} Peter Gutierrez ("Defendant") was charged with intimidation of a witness, contrary to NMSA 1978, § 30–24–3(A) (1997); aggravated stalking, contrary to NMSA 1978, § 30–3A–3.1(A) (1997); criminal damage to property over $1,000, contrary to NMSA 1978, § 30–15–1 (1963); telephone harassment, contrary to NMSA 1978, § 30–20–12 (1967); and evading and eluding an officer, contrary to NMSA 1978, § 30–22–1(B) (1981). Defendant was found guilty on all counts. Defendant appealed his convictions on two grounds, claiming (i) the prosecutor's comment on Defendant's refusal to submit to a polygraph examination during his opening statement constituted reversible error and (ii) insufficient evidence supported his conviction for evading or eluding an officer. The Court of Appeals concluded that while the prosecutor's comment was improper, it was harmless beyond a reasonable doubt. *State v. Gutierrez*, 2005–NMCA–093, ¶ 1, 138 N.M. 147, 117 P.3d 953. In addition, the Court of Appeals held that substantial evidence supported Defendant's conviction for evading and eluding an officer. *Id.*

{2} For the reasons that follow, we hold that the prosecutor's comment was not harmless error and thus reverse the Court of Appeals on that issue, vacate Defendant's convictions, and remand for a new trial. In addition, we hold that substantial evidence supports Defendant's conviction for evading and eluding an officer and thus affirm the Court of Appeals on that issue. Accordingly, Defendant may be retried on all counts.

**4**

## I. FACTS

{3} Defendant and Victim dated on and off for approximately five years beginning in 1997. It was a rocky relationship, and in February 2000, Victim obtained a restraining order against Defendant. However, Defendant and Victim were still periodically together, including when Defendant's mother died in February 2002. Despite the restraining order, Victim alleged that Defendant engaged in a variety of jilted lover conduct, including harassing phone calls and letters. In addition, Defendant placed harassing signs around the neighborhood, including in Victim's father's yard. Indeed, even after Defendant was arrested and in jail, Defendant phoned Victim and said, "You're dead."

{4} The particular incidents resulting in the charges against Defendant occurred while Victim was staying at a motel. Defendant phoned her at the motel and said, "Hello, whore." The next morning, May 2, 2002, Victim found that her car had been "keyed," with the word "whore" scratched into it. Victim drove from the motel to the police station and filed a report on the incident. Based on Victim's report, Officer Russell Gould of the Clovis Police Department was sent that same day to Victim's residence to investigate her allegations. While Officer Gould was making his report, Victim received a call from Defendant on her cell phone. Victim handed the phone to Officer Gould, after confirming that it was indeed Defendant calling, and Officer Gould heard the male caller say, "What do you think about last night?" several times, presumably in reference to Victim's stay at the motel. Officer Gould handed the phone back to Victim, so that she could try to get Defendant to say more, but, by the time she picked up, Defendant had hung up.

{5} Several hours after leaving Victim's house, Officer Gould was sent back because she reported to police that Defendant had called again and had driven by her house. Based on Victim's description of the vehicle, Officer Gould found the truck parked outside a house. Officer Gould was in police uniform and driving his patrol car. He stepped out of his car and told a man who walked out of the truck to stop because he needed to talk to him, in order to identify that the man was indeed Defendant. The man was walking into the house and said that he needed to use the bathroom. Officer Gould followed the man into the house, and as soon as the man saw him, he proceeded to walk out the back door. Once outside, the man looked at Officer Gould and then started running. Officer Gould gave chase, but the man had already jumped the fence. Officer Gould did not order the man to stop for the purpose of arresting him. Rather, he radioed dispatch that he was in a foot pursuit. By the time Officer Gould was off the radio, a second officer had arrived and was waiting for the man. After a brief struggle, the officers took the man, who was identified as Defendant, into custody.

{6} Detective Keith Bessette, who had previously questioned both Victim and Defendant, testified at trial that Defendant had denied making the signs and the phone calls but said that he might have written some letters when he was drunk. Detective Bessette spoke with Defendant again while he was in custody and testified that Defendant "kind of looked at me in a smug way, and in a joking manner, I said, 'Yeah, yeah, I know you didn't do it' and he told me 'I never said I didn't do it.'" Defendant also testified and admitted that although he might have written some letters to Victim while drunk, he denied having written the letters in question.

{7} At trial, the prosecutor made an opening statement, in which he referred to Defendant's refusal to submit to a polygraph test. Defendant immediately moved for a mistrial, arguing that the prosecutor's statement was an impermissible comment on silence that was highly prejudicial to Defendant, as the jury might inappropriately interpret his refusal as an acknowledgment of guilt. In a bench conference, the district judge noted that the jury might view the Defendant's refusal as relevant to Defendant's credibility and probative of guilt and admonished the prosecutor to refrain from any further reference to polygraph evidence. Nevertheless, the judge denied Defendant's motion, stating that he believed any prejudice to Defendant could be overcome by a curative instruction.

The judge, therefore, instructed the jury to ignore the prosecutor's comment.

{8} At the close of Defendant's case, he moved for a directed verdict on the evading and eluding an officer charge. *See* § 30–22–1(B). Defendant argued that the State failed to present sufficient evidence to convict him of the charge because Officer Gould was only in the investigative stage when he approached Defendant and was not about to apprehend or arrest him. The district court denied the motion, finding there were facts from which the jury could infer that Defendant was aware of the attempt to apprehend him and that he chose to flee instead. Defendant was found guilty on all counts.

{9} Defendant appealed his convictions, claiming two reversible errors: (i) that the prosecutor's comment regarding Defendant's refusal to submit to a polygraph test was an impermissible comment on silence which merited reversal and (ii) that Defendant was entitled to a directed verdict on the evading and eluding an officer charge due to the State's failure to put forth sufficient evidence. *Gutierrez*, 2005–NMCA–093, ¶ 1, 138 N.M. 147, 117 P.3d 953. The Court of Appeals held that while the prosecutor's comment was improper, it was harmless beyond a reasonable doubt. *Id.* ¶¶ 16–17. In addition, the Court of Appeals held that substantial evidence supported Defendant's conviction for evading and eluding an officer. *Id.* ¶ 21. Therefore, the Court of Appeals affirmed all of Defendant's convictions. *Id.* ¶ 22.

## II. PROSECUTOR'S COMMENT ON DEFENDANT'S REFUSAL TO SUBMIT TO A POLYGRAPH TEST WAS AN IMPROPER COMMENT ON SILENCE AND CONSTITUTES REVERSIBLE ERROR

{10} The first issue with which we are presented is whether the prosecutor's reference in opening statement to Defendant's refusal to submit to a polygraph test was an impermissible comment on silence constituting reversible error. Where, as here, the facts are undisputed, we review this legal question, which raises substantial questions of constitutional law, de novo. *State v.*

*DeGraff,* 2006–NMSC–011, ¶ 6, 139 N.M. 211, 131 P.3d 61; *State v. Foster,* 1998–NMCA–163, ¶ 8, 126 N.M. 177, 967 P.2d 852.

{11} We begin our analysis by emphasizing "the general rule forbidding a prosecutor from commenting on a defendant's silence or introducing evidence of silence." *Foster,* 1998–NMCA–163, ¶ 9, 126 N.M. 177, 967 P.2d 852. Following clear guidance from the United States Supreme Court, we have long held that prosecutorial comment on a defendant's exercise of his or her right to remain silent violates a defendant's rights under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment. *See State v. Miller,* 76 N.M. 62, 71–72, 412 P.2d 240, 245–246 (1966) (citing *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Tehan v. United States, ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966)). In *Foster,* our Court of Appeals explained at length the "three independent underpinnings for the general rule: (1) the constitutional privilege against self-incrimination, (2) constitutional due process, and (3) the rules of evidence barring irrelevant evidence . . . and evidence whose probative value is substantially outweighed by the danger of unfair prejudice." 1998–NMCA–163, ¶ 9, 126 N.M. 177, 967 P.2d 852 (internal citations omitted). The first, the constitutional privilege against self-incrimination, prohibits prosecutorial comment on a defendant's failure to testify at trial. *Id.* ¶¶ 9, 10. Second, due process forbids prosecutorial comment on a defendant's post-*Miranda* silence for the purpose of incriminating the defendant. *Id.* ¶¶ 11, 14; *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Doyle v. Ohio,* the United States Supreme Court emphasized the *Miranda* warning's implicit assurance "that silence will carry no penalty" and the concomitant unfairness and "deprivation of due process [of] allow[ing] the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The *Doyle* Court relied on its reasoning in *Johnson v. United States:*

An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him. His real choice might then be quite different from his apparent one.... Elementary fairness requires that an accused should not be misled on that score.

*Doyle,* 426 U.S. at 618 n. 9, 96 S.Ct. 2240 (quoting *Johnson,* 318 U.S. 189, 197, 63 S.Ct. 549, 87 L.Ed. 704 (1943)).

{12} Finally, even if the Constitution erects no barrier against the prosecution's use of a defendant's silence in a certain case, "New Mexico has been very cautious about the use of silence at trial." *Foster,* 1998–NMCA–163, ¶ 12, 126 N.M. 177, 967 P.2d 852. " 'Evidence of a defendant's postarrest silence is generally inadmissible because the probative value of the silence is substantially outweighed by the potential for unfair prejudice.' " *Id.* (quoting *State v. Garcia,* 118 N.M. 773, 776, 887 P.2d 767, 770 (Ct.App. 1994)); *see* Rule 11–402 NMRA; Rule 11–403 NMRA. Indeed, the United States Supreme Court in *Doyle* emphasized the "dubious probative value" of silence at the time of arrest, given its ambiguous nature. 426 U.S. at 617 n. 8, 96 S.Ct. 2240. The Court reemphasized this point in *Wainwright v. Greenfield,* stating, " 'just what induces post-arrest, post-*Miranda* silence remains as much a mystery today as it did at the time of the *Hale* decision. Silence in the face of accusation is an enigma and should not be determinative of one's mental condition just as it is not determinative of one's guilt.' " 474 U.S. 284, 294 n. 11, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (quoting *State v. Burwick,* 442 So.2d 944, 948 (Fla.1983)). For these reasons, we have made clear to prosecutors for over forty years the prohibition on comments regarding a defendant's silence. *See Miller,* 76 N.M. at 70–72, 412 P.2d at 245–46.

{13} The core issue before us, however, is whether the prosecutor's statement regarding Defendant's refusal to submit to a polygraph test constitutes such an impermissible comment on silence, a question of first impression for this Court. We must answer this threshold question in order to determine whether Defendant's federal constitutional rights are implicated.

{14} Defendant objected to the following portion of the prosecutor's opening statement:

So at that point in time the Defendant is arrested. Detective Keith Bessette goes, reads the Defendant his rights, asks to talk to him. Defendant says he didn't do the signs, make any calls, he might have wrote [sic] the letters while he was drunk. More conversation comes out. Detective asks him, "Okay, your side, you want to take a polygraph?" He says, "No."

Defendant immediately moved for a mistrial, arguing the prosecutor's statement was an impermissible comment on silence that was highly prejudicial to Defendant, as the jury might inappropriately interpret his refusal as an acknowledgment of guilt. The district court, however, denied the motion and instructed the jury to disregard the comment.

{15} In determining whether the prosecutor's statement constitutes an improper comment on Defendant's silence in contravention of the Fifth Amendment, we begin our analysis with a relevant observation made by our Court of Appeals in *State v. Casaus,* 1996–NMCA–031, 121 N.M. 481, 913 P.2d 669. In *Casaus,* the defendant argued that a State witness's reference to the defendant's *willingness* to submit to a polygraph test warranted a mistrial because it was an improper comment on his Fifth Amendment right to silence. *Id.* ¶ 34. The Court of Appeals disagreed, *id.,* and noted that "[n]ot only was that information not prejudicial to [d]efendant, but it could reasonably have been perceived by the jury to help [d]efendant's case by making it appear as if he had nothing to hide." *Id.* ¶ 36. In actuality, the defendant never underwent a polygraph examination, and he indeed waived his *Miranda* rights and submitted to an interview. *Id.* ¶¶ 35, 37. The Court concluded there was no improper comment on silence. *Id.* ¶ 37. The instant case is distinguishable because the prosecutor referred to Defendant's *refusal* to submit to a polygraph test. With respect to such a situation, the *Casaus* Court observed that the mere mention of a poly-

graph exam might cause the jury to speculate as to why the defendant did not take the polygraph test and to wrongfully infer guilt from the refusal. *Id.* ¶ 36. The Court's observation reflects "[t]he essence of *Doyle* [which] is that it is fundamentally unfair to assure a suspect that silence will carry no penalty" and then to comment on that silence, by noting a defendant's refusal to submit to a polygraph test, as probative of his or her guilt. *See Garcia,* 118 N.M. at 778, 887 P.2d at 772. The comment at issue in the instant case thus reflects the same fundamental unfairness as prosecutorial comment on a defendant's failure to testify at trial or to make a statement to law enforcement.

{16} Many other jurisdictions have held the type of comment at issue in this case to be an improper comment on a defendant's right to silence in violation of the Fifth Amendment. *See United States v. Stackpole,* 811 F.2d 689, 694–95 (1st Cir.1987) (stating that admission of a tape and transcript indicating defendant refused to take a polygraph test was error but holding the error to be harmless); *United States v. Kiszewski,* 877 F.2d 210, 216–17 (2d Cir.1989) (analyzing the prejudice of admission of a government witness's statement that the defendant refused to submit to a polygraph test but ultimately finding harmless error); *United States v. Murray,* 784 F.2d 188, 188–89 (6th Cir.1986) (holding that deliberate "mention of a polygraph test introduced serious error into this record" and, therefore, remanding for a new trial because the error was not harmless beyond a reasonable doubt); *Bowen v. Eyman,* 324 F.Supp. 339, 341 (D.Ariz.1970) (holding that testimony regarding the defendant's refusal to submit to a polygraph test was "constitutionally impermissible" as a violation of the defendant's right to silence under the Fifth Amendment); *see also Melvin v. State,* 606 A.2d 69, 71–72 (Del.1992) (holding that "polygraph examinations are testimonial for purposes of the Fifth Amendment and, therefore, are subject to an individual's protection against self-incrimination" and noting that "[e]vidence that an individual refused to submit to a polygraph test is no more permissible than forcing an accused to submit to a polygraph examination and then using the results against him or her"); *State*

*v. Driver,* 38 N.J. 255, 183 A.2d 655, 658–59 (1962) (holding that prosecutor's repeated reference in opening statement to defendant's refusal to submit to a polygraph test "possess[ed] such horrendous capacity for prejudice against the defendant as to constitute plain error"); *Kugler v. State,* 902 S.W.2d 594, 597 (Tex.Ct.App.1995) (reversing and remanding for a new trial where "the testimony that revealed appellant's refusal to submit to a polygraph examination was unduly persuasive and cannot be cured by an instruction to disregard").

{17} We now adopt this line of reasoning and hereby hold that prosecutorial comment on a defendant's refusal to submit to a polygraph test is an impermissible comment on a defendant's right to silence in violation of the Fifth Amendment. *See United States v. Walton,* 908 F.2d 1289, 1293 (6th Cir.1990) (observing that "a statement suggesting that a criminal defendant either took and failed a polygraph examination or refused to take an examination directly relates to guilt and implicates a defendant's fifth amendment right not to incriminate himself").

## III. PROSECUTOR'S COMMENT IN OPENING STATEMENT ON DEFENDANT'S REFUSAL TO SUBMIT TO A POLYGRAPH TEST WAS NOT HARMLESS ERROR BEYOND A REASONABLE DOUBT

{18} Having so held, we now determine the appropriate remedy for this violation of Defendant's constitutional rights. We recently observed that in cases in which a defendant has properly objected at trial, we review prosecutorial comment on silence to determine whether the error is harmless beyond a reasonable doubt. *DeGraff,* 2006–NMSC–011, ¶ 22, 139 N.M. 211, 131 P.3d 61. Indeed, our general rule is to review violations of federal constitutional rights under a harmless error standard. *State v. Alvarez–Lopez,* 2004–NMSC–030, ¶ 25, 136 N.M. 309, 98 P.3d 699 (noting that whether violation of a federal constitutional right is harmless is a federal question). The State has the burden of establishing that the constitutional error was " 'harmless beyond a reasonable doubt.' "

*Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). "Federal constitutional error cannot be deemed harmless if 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We take care not "to focus our harmless error analysis exclusively on whether the trial record consisted of overwhelming evidence of the defendant's guilt," so as not to "risk inadvertently concluding that constitutional error was harmless simply because there was substantial evidence to support the conviction." *Id.* ¶ 30. We emphasize that "in a proper harmless error analysis, the appellate court defers to the jury verdict *only* when the State has established beyond a reasonable doubt that the jury verdict was not tainted by the constitutional error." *Id.* This is so because "even if conviction *appears* inevitable, there is a point at which an error becomes too great to condone as a matter of constitutional integrity and prosecutorial deterrence." *Id.* ¶ 31 (quoted authority omitted). While "[t]he strength of the properly admitted evidence is a factor in evaluating the likely impact on the jury of the constitutional error," *id.* ¶ 32, "constitutional error cannot be deemed harmless simply because there is overwhelming evidence of defendant's guilt." *Id.* Rather, we focus "squarely on assessing the likely impact of the error on the jury's verdict." *Id.*

{19} We decline to adopt a rule of automatic reversal for every prosecutorial comment on silence, as urged by Defendant. Such a rule would represent a sharp departure from strong, existing precedent which requires application of a harmless error standard. We thus consider whether the State has met its burden of establishing that there is no reasonable probability that the prosecutor's reference to Defendant's refusal to submit to a polygraph test contributed to Defendant's convictions. For the following reasons, the State has failed to persuade us that the error was harmless beyond a reasonable doubt.

{20} In assessing the impact of the prosecutor's statement, we examine the context in which it was made. In the opening statement, the prosecutor should present an objective summary of the evidence the State reasonably expects to produce at trial and must not refer to "evidence of questionable admissibility or evidence unsupported at trial." *United States v. Novak*, 918 F.2d 107, 109 (10th Cir.1990) (internal citation omitted). The opening statement holds a uniquely important place in the trial because it is the lens through which the jury views and evaluates the entire trial. Therefore, the prosecutor must take special care to refrain from improper comments, including comments on a defendant's silence. In the instant case and in general, the prosecutor should have been aware of the issues created by the mere mention of a polygraph test, especially where as here one was never administered, as well as the prejudice to the Defendant of such a statement. As the New Jersey Supreme Court very succinctly explained it decades ago:

> [T]o tell a jury of laymen at the very outset of the trial that defendant refused ... to take a lie detector test ... create[s] a probable aura of prejudice which ... permeate[s] the proceeding to the very end.... In terms of degree of prejudice, the average jury ... might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imperfection. A refusal might be regarded as indicating a consciousness of guilt—undoubtedly the reason here why the ... Prosecutor placed such emphasis upon it in his opening.

*Driver*, 183 A.2d at 658.

{21} The record in the instant case contains strong evidence to support Defendant's convictions. Victim testified about the stalking and harassment, and Detective Bessette testified about his conversation with Defendant in which Defendant stated, "I never said I didn't do it." Indeed, Defendant himself testified at trial, and his only defense was denial. Notwithstanding this evidence upon which the jury could have relied to convict Defendant, we made clear in *Alvarez–Lopez* that our harmless error review is not simply

a matter of weighing the evidence. 2004–NMSC–030, ¶¶ 29–32, 136 N.M. 309, 98 P.3d 699. Rather, we assess the likely impact of the constitutional violation on the verdict. Defendant's credibility was crucial since he testified at trial, and denial was his only defense. The prosecutor's mention of Defendant's refusal to submit to a polygraph test tainted the jury's view of the evidence from the very outset of trial in a way that could not be undone and denied Defendant a fair trial. Indeed, the trial judge acknowledged the prejudicial effect of the prosecutor's statement, in particular, during the bench conference, noting that Defendant's "statement that he wouldn't take [a polygraph test] because he would fail does go to consciousness of guilt whether he takes it or not" and that polygraph evidence is "so controversial" that he admonished the prosecutor to "just stay away from [it] all together." Nevertheless, the judge denied Defendant's motion for a mistrial, stating that he believed any prejudice to Defendant could be overcome by a curative instruction. We disagree and address this issue shortly.

{22} Notwithstanding the district court's curative instruction, Defendant's refusal to take a polygraph test

> was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect.... The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the apparatus functioned.

*Driver*, 183 A.2d at 659. We are not convinced that the improper comment on Defendant's silence, especially at this crucial juncture in trial, did not contribute to Defendant's convictions.

{23} The State argues that any error caused by the prosecutor's statement was effectively cured by the district court's instruction to the jury to disregard the prosecutor's comment. In determining whether error is harmless, we consider the curative instruction given by the district court. *Garcia*, 118 N.M. at 779, 887 P.2d at 773. In the instant case, the judge instructed the jury to ignore the prosecutor's comment, stating:

> Ladies and gentlemen, a moment ago [the prosecutor] made a reference to a polygraph and for purposes of the trial today, I don't want you to consider anything relating to a polygraph, whether there were questions asked about it or what the responses might have been. Please keep that just out of your minds. That won't play a part in the determination of the case. All right. Thank you. [Prosecutor], go ahead.

The instruction was so vague that it failed to inform the jury adequately of its duty to disregard the improper comment. *See Garcia*, 118 N.M. at 778, 887 P.2d at 772. "Indeed, the vagueness was probably intentional, because any direct comment on [d]efendant's postarrest silence posed the risk of emphasizing the matter to the jury." *Id.; see also Miller*, 76 N.M. at 71, 412 P.2d at 245–46 (holding that the curative instruction "d[id] not sufficiently remove the impression created by the prosecutor's comments [on defendant's silence] from the minds of the jury, and in fact may magnify any impression"). The profound unfairness and prejudice of a comment on a defendant's postarrest silence, no matter how seemingly innocuous, is difficult to cure. *See Garcia*, 118 N.M. at 778–79, 887 P.2d at 772–73; *see also Murray*, 784 F.2d at 188–89 (holding that a curative instruction given for deliberate introduction of a comment regarding a polygraph test was ineffective in curing the prejudicial error because "[s]uch an instruction ... is very close to an instruction to unring a bell"); *Bowen*, 324 F.Supp. at 342 ("[E]ven when there is a clear instruction to disregard testimony referring to a defendant's refusal to submit to a lie detector test, the courts, in recognition of the highly prejudicial effect of such testimony, have held that the instruction does not cure the error."). This case is no exception. An opening statement is counsel's opportunity to make an indelible first impression on the jury. Prejudicial comment on silence, particularly

at this stage, is inherently difficult to overcome. Neither the instruction given, nor a more explicit one, would have sufficed to cure the error introduced by the prosecutor's comment in this case.

{24} We take this opportunity to reiterate our caution to prosecutors that they risk reversal, including in cases in which the evidence supporting a conviction is very strong, if they make inappropriate and constitutionally violative mention of a defendant's postarrest silence, including his or her refusal to submit to a polygraph test. It is the timing and effect of such comments, not merely the weight of the evidence, that figures into our harmless error calculus. We conclude our analysis of this issue by repeating an observation this Court made many years ago:

> The zeal ... of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty.... When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless.... [T]he presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty.

*State v. Frank*, 92 N.M. 456, 460, 589 P.2d 1047, 1051 (1979) (quoting *State v. Rowell*, 77 N.M. 124, 128–29, 419 P.2d 966, 970 (1966)). We, therefore, conclude that the error introduced by the prosecutor's improper comment on Defendant's refusal to submit to a polygraph test was not harmless beyond a reasonable doubt and, accordingly, reverse the Court of Appeals on that issue, vacate Defendant's convictions, and remand for a new trial.

## IV. SUBSTANTIAL EVIDENCE SUPPORTS DEFENDANT'S CONVICTION FOR EVADING AND ELUDING AN OFFICER

{25} Defendant claims the State failed to put forth sufficient evidence to support his conviction for evading and eluding an officer, contrary to Section 30–22–1(B). In particular, Defendant contends he lacked the requisite knowledge that Officer Gould was attempting to apprehend or arrest him because Officer Gould was only in the investigative stage when he approached Defendant; and because he had not yet identified Defendant, Officer Gould was not about to apprehend or arrest him when Defendant fled. Although we vacate all of Defendant's convictions based on the prosecutor's improper comment on Defendant's refusal to submit to a polygraph test, we are still compelled to address the sufficiency of the evidence to support Defendant's conviction for evading and eluding an officer. If the evidence is found to be insufficient, the Double Jeopardy Clause, U.S. Const. amend. V, bars retrial of Defendant on this charge. *State v. Sanchez*, 2000–NMSC–021, ¶ 30, 129 N.M. 284, 6 P.3d 486.

{26} We apply a substantial evidence standard when reviewing convictions to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We "view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* We do not weigh the evidence, nor do we "substitute [our] judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Id.*

{27} Section 30–22–1(B) provides: "Resisting, evading or obstructing an officer consists of intentionally: fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him." The State has the burden of proving two elements beyond a

reasonable doubt. UJI 14–2215 NMRA. First, the State must prove that the officer was a peace officer in the lawful discharge of duty. *Id.* This element is not in dispute. Officer Gould was fully uniformed and driving a marked patrol car. Second, the State must prove that the defendant, with the knowledge that the officer was attempting to apprehend or arrest the defendant, fled, attempted to evade, or evaded the officer. *Id.*

{28} Our analysis of whether the State met its burden on the second element is an issue of first impression, as we have never addressed whether Section 30–22–1(B) applies to situations, such as the instant one, in which an officer is attempting a temporary seizure based upon reasonable suspicion. In other words, we must determine whether the Legislature intended the term "apprehend" to include such temporary seizures or whether "apprehend" is synonymous with "arrest." One of the essential elements of Section 30–22–1(B) is that the defendant have "knowledge that the officer is attempting to apprehend or arrest him." In this case, Officer Gould was not attempting to *arrest* Defendant. When asked at trial whether he ordered Defendant to stop for the "purpose of arresting him or anything of that nature," Officer Gould responded, "Not at that time." If Officer Gould did not intend to arrest Defendant and only sought to question him, then Defendant could not have knowledge of his impending arrest. So, this case turns on whether Defendant knew Officer Gould was attempting to *apprehend* him. Thus, the question becomes whether "apprehend" was intended to include temporary, investigative seizures, such as the seizure Officer Gould attempted in this case.

{29} The Fourth Amendment to the United States Constitution requires that an officer have reasonable, articulable suspicion of criminal activity to justify a temporary seizure for the purpose of questioning, and the questioning must be limited to the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). This type of detention for investigative purposes is often referred to as a *"Terry* stop" because it evolved from the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Although *Terry* stops must be brief, *Kolender v. Lawson*, 461 U.S. 352, 365, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), an officer may detain the person for a short time, during which the person is not free to walk away from the encounter. *See Royer*, 460 U.S. at 498, 103 S.Ct. 1319 (stating that "reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop"). During a *Terry* stop, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). However, the person being detained may decline to answer questions and is under no obligation to respond. *Id.; Kolender*, 461 U.S. at 365, 103 S.Ct. 1855; *Terry*, 392 U.S. at 34, 88 S.Ct. 1868 (White, J., concurring) ("[T]he person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest...."). Additionally, if the answers do not provide the officer with probable cause justifying an arrest, the person being detained must be released. *Berkemer*, 468 U.S. at 439–40, 104 S.Ct. 3138.

{30} In determining whether Section 30–22–1(B) applies to a *Terry* stop, "[o]ur ultimate purpose ... is to ascertain and give effect to the intent of the Legislature." *See State v. Cleve*, 1999–NMSC–017, ¶ 8, 127 N.M. 240, 980 P.2d 23. The plain language of the statute is the primary indicator of legislative intent, so we look first to the words the Legislature used and their ordinary meaning. *Id.* The Legislature chose to use "apprehend or arrest" in Section 30–22–1(B), as opposed to "arrest" alone, thus indicating the Legislature recognized a difference between the two terms. "Arrest" refers to "the taking or keeping of a person in custody by legal authority," Black's Law Dictionary 104 (7th ed.1999), and would necessarily also involve apprehending the person. The definition of "apprehend" is, however, broader and includes not only arrests, but also "seizure[s] in the name of the law." *Id.*

at 97; *see also* Webster's Third New International Dictionary 106 (1971) (defining "apprehend" as "to take (a person) in legal process: ARREST, *SEIZE* ") (emphasis added). Because a *Terry* stop is a temporary seizure, *Royer*, 460 U.S. at 498, 103 S.Ct. 1319, we conclude that the Legislature intended the term "apprehend" in Section 30–22–1(B) to include a situation in which an officer is attempting to briefly detain a person for questioning based on reasonable suspicion.

{31} We are guided in reaching this conclusion by the legislative purpose of Section 30–22–1(B) which is to deter people from fleeing from officers. *See State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (To give effect to the legislative intent, reference must be had "to the object the legislature sought to accomplish and the wrong it sought to remedy." (internal quotation marks and citations omitted)). Requiring that an officer be attempting a formal arrest, and not simply a *Terry* stop, would encourage a person to walk away from an officer who has a reasonable suspicion that the person was or is about to be involved in criminal activity. While a person has the constitutional right to walk away from an officer who lacks reasonable suspicion and simply wants to question the person, a person who walks away from an officer attempting to detain that person based on reasonable suspicion can be charged with evading and eluding an officer under Section 30–22–1(B).

{32} Next, we address whether Officer Gould had reasonable suspicion that Defendant had committed or was about to commit a crime. *Royer*, 460 U.S. at 498, 103 S.Ct. 1319. This issue is crucial to our determination of whether sufficient evidence supports Defendant's conviction because without reasonable suspicion, Officer Gould lacked the legal authority to detain Defendant. Courts have consistently recognized that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen." *Id.* at 497, 103 S.Ct. 1319. "So long as a reason-

able person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoted authority omitted). Of course, the corollary of this rule is that when an officer does not have reasonable suspicion, and a seizure does not occur,

> [t]he person approached ... need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

*Royer*, 460 U.S. at 497–98, 103 S.Ct. 1319 (internal citations omitted). Thus, if Officer Gould lacked reasonable suspicion, the encounter was not a seizure, and he would, therefore, have lacked legal authority to detain Defendant.

{33} Viewed in the light most favorable to the verdict, the facts of this case support the conclusion that Officer Gould had the authority to approach Defendant and briefly detain him based on his reasonable suspicion that Defendant was the man who had been stalking Victim. Victim gave a description of the vehicle Defendant was driving, a white truck, and Officer Gould located a vehicle matching that description. Defendant then got out of the vehicle and matched the description Victim had given the police. The officer also noticed that the passenger in the vehicle did not fit Victim's description of the suspect. The fact that Defendant and the vehicle he stepped out of matched Victim's descriptions demonstrates that Officer Gould had reasonable, articulable suspicion to support temporarily detaining Defendant for the purpose of determining his identity and investigating his involvement in stalking Victim.

{34} We must now determine whether Defendant had the right to walk away. This determination depends on whether there was a "show of authority" sufficient for a seizure, which is an objective test and depends on whether the officer's words or actions would have conveyed to a

reasonable person that he was being ordered to "restrict his movement." *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In the instant case, Officer Gould "asked [Defendant] to stop" because he needed to talk to him. Additionally, after Defendant said he needed to use the bathroom, Officer Gould followed him into the house, but Defendant ran out the back door after he turned and saw the officer behind him. Officer Gould then chased Defendant through the house and out the back door. Officer Gould's words, as well as his actions in following Defendant into the house and chasing him, would indicate to a reasonable person that he was not free to leave and that the officer wanted to detain him for questioning.

{35} Therefore, because Officer Gould had reasonable suspicion to detain Defendant, and because a reasonable person would have known the officer was attempting to detain him, Defendant should have obeyed Officer Gould's request to stop and was not free to walk away. Defendant certainly had the right to not answer Officer Gould's questions, but he did not have the right to walk away immediately. However, we emphasize that had the officer in this case not articulated reasonable suspicion to support detaining Defendant, or if a reasonable person would not have understood he was not free to leave, Defendant could not then be punished for evading and eluding an officer simply because he exercised his constitutional right to walk away from the officer and end the encounter.

{36} Our inquiry does not end with the determination that Officer Gould had reasonable suspicion and that a reasonable person would have understood the officer wanted to detain him. We must also address the essential element of Section 30–22–1(B) of whether Defendant subjectively knew the officer was attempting to apprehend him. The jury could have reasonably inferred Defendant's knowledge from many of the same facts which also support our conclusion that a reasonable person would have understood he was not free to walk away. *See State v. Gee*, 2004–NMCA–042, ¶ 24, 135 N.M. 408, 89 P.3d 80 (noting that "[i]ntent may be inferred from circumstantial evidence"). In particular, Defendant was subject to a restraining order for prior threatening behavior towards Victim, which Defendant should have been aware he was violating if he did the acts Victim alleges in this case. Defendant was being followed by Officer Gould, a fully uniformed police officer in a marked patrol car, based on Victim's allegations and descriptions of Defendant and his vehicle. Officer Gould stepped out of his car and asked Defendant to stop because he needed to talk to him. Defendant, however, ignored Officer Gould and went inside the house and then continued walking out the back door and fled running, after spotting the officer behind him. Defendant was apprehended after attempting to fight off Officer Gould and the other arresting officer who had arrived in the meantime. We have previously recognized that evidence of flight is admissible to show consciousness of guilt. *State v. Jacobs*, 2000–NMSC–026, ¶ 15, 129 N.M. 448, 10 P.3d 127. The evidence of Defendant's flight, coupled with the circumstantial evidence the State presented, was sufficient to give rise to fair inferences of fact that Defendant understood that Officer Gould was attempting to arrest or apprehend him. Even if Defendant did not know Officer Gould intended to apprehend him for questioning when he first approached Defendant, Defendant most certainly knew Officer Gould wanted to detain him when he started chasing him. Therefore, viewed in the light most favorable to the verdict, substantial evidence supports Defendant's subjective knowledge that Officer Gould was attempting to apprehend him or detain him for questioning. Accordingly, we affirm the Court of Appeals on this issue and hold that Defendant may be retried on the charge of evading and eluding an officer, contrary to Section 30–22–1(B).

## V. CONCLUSION

{37} Prosecutorial comment on a defendant's refusal to submit to a polygraph test implicates a defendant's right to silence under the Fifth Amendment and constitutes reversible error. We hold that the prosecutor's comment on Defendant's refusal to submit to a polygraph test during opening statement constitutes error, which was not

harmless beyond a reasonable doubt. In addition, we hold that Section 30–22–1(B) applies to situations in which an officer is attempting to temporarily detain a person through a *Terry* stop, not only to formal arrests and, therefore, conclude that substantial evidence supports Defendant's conviction for evading and eluding an officer. Accordingly, we vacate the Defendant's convictions and remand for a new trial in which Defendant may be retried on all counts.

{38} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PAMELA B. MINZNER, PETRA JIMENEZ MAES, and RICHARD C. BOSSON, Justices.